UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| DEANGELO GAINES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:16-cv-00139-JRS-DLP |
| | ) | |
| CORIZON HEALTH, | ) | |
| LOLIT JOSEPH, | ) | |
| BRYAN BULLER, | ) | |
| ALEXANDREA WARREN, | ) | |
| MIKE NATALIE, | ) | |
| FARRAH BUNCH, | ) | |
| KAYLA MCDERMIT, | ) | |
| GRAHAM MOORE, | ) | |
| DEBORAH WHITE, | ) | |
| KATHY EDRINGTON, | ) | |
| JESSICA HIRT, | ) | |
| NICHOLAS OSBORNE, | ) | |
| MICHAEL ALUKER Dr., | ) | |
| TAMMY OWEN, | ) | |
| BARRY CLEVELAND, | ) | |
| KARI PIERCE, | ) | |
| CASSANDRA FELIX, | ) | |
| INDIANA DEPARTMENT OF CORRECTION, | ) | |
| PEGGY MCWHIRTER, | ) | |
| | ) | |
| Defendants. | ) | |

**Entry Granting Defendants' Unopposed Motion for Summary Judgment**

For the reasons explained in this Entry, the unopposed motion for summary judgment filed

by defendants Corizon, LLC ("Corizon"), Lolit Joseph, M.D., Mike Natalie, Farrah Bunch, Kayla

McDermit, Graham Moore, Kathy Edrington, Jessica Hirt, Tammy Owen, Barry Cleveland, Kari

Pierce, Cassandra Felix, Peggy McWhirter, Nicholas Osborne, and Deborah White (collectively

"Defendants"), [dkt. 230], is **granted.** The claims against all other defendants have been resolved

through screening of the amended complaint, voluntary dismissal, summary judgment, or settlement.

## I.    Background

Plaintiff Deangelo Gaines filed this civil rights action on April 25, 2016. At the time of filing, he was incarcerated at the Putnamville Correctional Facility ("Putnamville"). He filed an amended complaint on July 5, 2016. Dkt. 10. The Court screened the amended complaint and allowed claims of deliberate indifference to proceed against the Defendants. Mr. Gaines seeks compensatory, punitive, and nominal damages.

The Defendants have provided medical records, affidavits, and argument relating to incidents dating back to January 2013, when Mr. Gaines arrived at Putnamville. The Court construes this as a waiver of any statute of limitations defense. *See Serino v. Hensley,* 735 F.3d 588, 590 (7th Cir. 2013) (Indiana's two-year personal injury statute of limitations applies to section 1983 claims).

## II.  Summary Judgment Standards

The purpose of summary judgment is to "pierce the pleadings and to assess the proof to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in

that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris,* 550 U.S. 372, 380 (2007).

The Defendants' motion for summary judgment, brief in support, and Local Rule 56-1 notice were served on Mr. Gaines on or about March 14, 2018. Dkt. nos. 230, 231, 232, 233. As noted, even though Mr. Gaines requested one extension of time, no response has been filed, and the deadline for doing so has long passed.

The consequence of Mr. Gaines' failure to respond is that he has conceded the Defendants' version of the facts. *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission."); *see* S.D. Ind. Local Rule 56-1 ("A party opposing a summary judgment motion must . . . file and serve a response brief and any evidence . . . that the party relies on to oppose the motion. The response must . . . identif[y] the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment."). This does not alter the standard for assessing a Rule 56(a) motion, but does "reduc[e] the pool" from which the facts and inferences relative to such a motion may be drawn. *Smith v. Severn,* 129 F.3d 419, 426 (7th Cir. 1997).

# III.    Discussion

## A.  Plaintiff's Claims

As outlined in the Court's Entry screening the amended complaint, dkt. 11, Mr. Gaines' remaining claims are as follows:

1) Corizon has a policy or practice of: a) not providing seizure helmets to inmates with seizure disorders, b) preventing inmates with seizure disorders from being housed on the ground floor at Putnamville, and c) denying elevator passes to inmates with seizure disorders.

2) Defendants Kathy Edrington, Dr. Lolit Joseph, Nicholas Osborne, Mike Natalie, Farrah Bunch, Nurse Kayla McDermit, Nurse Graham Moore, L.P.N. Deborah White, Jessica Hirt, Peggy McWhirter, Tammy Owen, Barry Cleveland, Kari Pierce, and Cassandra Felix were deliberately indifferent to his serious medical needs by denying his requests for a seizure helmet.

3) Defendants Kathy Edrington and Farrah Bunch were deliberately indifferent to his serious medical needs when they denied him a permit to be housed on the ground floor.

4) Defendant Farrah Bunch was deliberately indifferent to his serious medical needs when she denied him access to the elevator.

## B.  Undisputed Facts

The following facts, unopposed by Mr. Gaines and supported by admissible evidence, are accepted as true for purposes of the motion for summary judgment:

At all times relevant to the amended complaint, Mr. Gaines was an inmate at Putnamville. Mr. Gaines was released from prison on or about December 6, 2017.

4

There are two medical providers among the many Defendants. Defendant Lolit Joseph is a physician licensed to practice medicine in Indiana. When Mr. Gaines filed his amended complaint, Dr. Joseph was employed at Putnamville by Corizon, a private company that previously contracted with the Indiana Department of Correction to provide healthcare to Indiana prisoners. Dr. Joseph's employment with Corizon ended on September 4, 2014.

Defendant Nicholas Osborne is an advanced practice nurse ("APN") licensed in Indiana. An APN is also referred to as a nurse practitioner ("NP"). An NP is considered a provider and can diagnose patients, prescribe medications, and make treatment plans for patients just like a physician. At all times relevant to Mr. Gaines' amended complaint, Nicholas Osborne was employed by Corizon at Putnamville. NP Osborne is familiar with Mr. Gaines and his medical condition and treatment, however, he was not personally involved in Mr. Gaines' medical care and treatment related to his seizure disorder. From the medical records, it appears that NP Osborne was the provider of record on a few occasions in which Mr. Gaines received a flu shot, had his blood drawn, or was assessed by other nursing staff. That means that his name appears on the medical record as the provider, but does not mean he actually saw the patient that day.

Defendants Barry Cleveland, Peggy McWhirter, and Graham Moore are registered nurses ("RN") in Indiana. At all times relevant to Mr. Gaines' amended complaint, they were employed at Putnamville by Corizon. As nurses, RN Cleveland, RN McWhirter, and RN Moore provided patient care, which included, but was not limited to, assessing patients, obtaining vital signs, applying splints, reporting their findings to the provider (i.e., a physician or nurse practitioner), and following the providers' orders, such as administering and dispensing medications. As nurses, RN Cleveland, RN McWhirter, and RN Moore did not prescribe medications, diagnose patients, develop a treatment plan for patients, or dictate a patient's medical

care—only a provider (i.e., physician or nurse practitioner) can do that.

Defendant Farrah Bunch is an RN in Indiana. At all times relevant to Mr. Gaines' amended complaint, RN Bunch was employed as the Health Services Administrator ("HSA") by Corizon. RN Bunch's role as the HSA was administrative; she did not perform nursing duties. As both an RN and HSA, Bunch did not have the authority to order diagnostic testing, outside provider consults, or medications, as those are functions of the provider. Her job as the HSA at Putnamville was to order medical supplies for the facility, hire medical staff, maintain the nursing staff schedule, respond to offender grievances regarding medical issues, and deal with human resources issues for the medical staff. As the HSA, patients would sometimes address Request for Healthcare ("RFHC") forms to her, but that does not mean that she received the form or that she was aware a patient had addressed the form to her. RFHC forms are submitted to the medical department and responded to by nursing staff. As an administrator, she typically did not review and respond to RFHC forms.

From July 23, 2012, to November 1, 2013, Mike Natalie was the HSA at Putnamville. From January 1, 2014, to April 1, 2014, he was the interim HSA at Putnamville. At all times relevant to this lawsuit, Mr. Natalie was employed by Corizon. Mr. Natalie had no personal involvement in the delivery of Mr. Gaines' medical care and treatment, as he is not a medical provider of any kind. He did not treat offenders and has never treated Mr. Gaines. His role as the HSA was solely administrative. As the HSA, he did not—and could not—prescribe medication or medical devices, including a seizure helmet. Additionally, as the HSA, Mr. Natalie did not—and could not—make any diagnoses or decisions regarding what medical treatment Mr. Gaines needed, including a seizure helmet. Only a provider can make decisions regarding medication, diagnoses, and treatment, including a seizure helmet. As the HSA, it was not within

Mr. Natalie's purview to order a bottom floor assignment or an elevator pass. Those orders had to be issued by a provider (i.e., physician or nurse practitioner).

Defendant Kayla McDermit is an RN in Indiana. At all times relevant to Mr. Gaines' amended complaint, RN McDermit was employed by Corizon. From November 2014 to July 2015, RN McDermit was a staff nurse at Putnamville. In July 2015, RN McDermit was promoted to Director of Nursing ("DON"). In her role as a staff nurse, McDermit provided patient care, which included, but was not limited to, assessing patients, obtaining vital signs, reporting her findings to the provider, and following the providers' orders, such as administering and dispensing medications. Her role as the DON was mostly administrative, but she did sometimes perform nursing duties when needed. As an RN, she was able to enter the providers' orders into the respective computer systems. Additionally, she was able to request outside provider consults at the direction of the provider. As the DON, RN McDermit would sometimes respond to informal grievances. Neither of these roles allowed her to prescribe medications, diagnose patients, develop a treatment plan for patients, or dictate a patient's medical care—only a provider can do that.

Defendant Kari Pierce is a medical assistant ("MA"). At all times relevant to Mr. Gaines' amended complaint, MA Pierce was employed at Putnamville by Corizon. As an MA, Pierce followed the direction of the doctors and nursing staff regarding what to do with a particular patient. MA Pierce did not—and could not—prescribe medication or medical devices, including a seizure helmet, for Mr. Gaines. Additionally, as an MA, she did not—and could not—make any diagnoses or decisions regarding what medical treatment Mr. Gaines needed, including a seizure helmet. Only a provider can make decisions regarding medication, diagnoses, and treatment, including a seizure helmet. It was not within her scope of practice to order a bottom

floor assignment, a no-stairs pass, or an elevator pass. Those orders had to be issued by a provider.

Defendants Cassandra Felix, Tammy Owen, Kathy Edrington, Jessica Hirt, and Deb White are licensed practical nurses ("LPN") in Indiana. As LPNs, they do not prescribe medication for patients, make diagnoses, or determine what medical treatment is appropriate. They assess the patient, relay the information to the provider (i.e., physician, physician's assistant, or nurse practitioner) and carry out the provider's orders regarding medication or treatment. Because they are LPNs, they did not—and could not—prescribe medication or medical devices, including a seizure helmet, for Mr. Gaines. Additionally, as LPNs, they did not—and could not—make any diagnoses or decisions regarding what medical treatment Mr. Gaines needed, including a seizure helmet. As LPNs, it was not within their scope of practice to order a bottom floor assignment, a no-stairs pass, or an elevator pass for any inmate. Those orders had to be issued by a provider. Part of their job duties at the prison was to review and respond to offenders' RFHC forms. If the request was to see the provider for an objectively non-urgent issue, they would refer the patient for an appointment with the provider and they would convey to the patient that he had been referred to the provider.

While incarcerated, Mr. Gaines was enrolled in the Chronic Care Clinic for seizures. Chronic Care Clinic patients are evaluated approximately every 90 days to evaluate their chronic conditions. On January 14, 2013, LPN Edrington performed Mr. Gaines' intake evaluation at Putnamville. Mr. Gaines reported that his medical history included a seizure disorder and high cholesterol. Mr. Gaines reported that his surgical history included surgery to his head in 1997, back surgery in 2001, and knee surgery in 2005. Mr. Gaines' suicide risk assessment was negative. Mr. Gaines reported some outpatient mental health treatment in 1997.

Mr. Gaines' chronic medical problems included epilepsy, psoriasis, alcohol dependence

syndrome, and major depressive disorder. Mr. Gaines' medications included Depakote (for seizures), Lamictal (for seizures), Pravachol (for high cholesterol), Remeron (for depression), and Risperdal (for depression).

Mr. Gaines arrived at the prison with head gear for seizures. He did not wear the helmet all the time, however. On February 2, 2013, Mr. Gaines had a seizure, but he was not wearing his helmet. When he became more alert, he refused to put on his helmet. On February 4, 2013, RN Moore evaluated Mr. Gaines for nausea and vomiting secondary to drug abuse. Mr. Gaines argued with RN Moore saying that he had given him the wrong dosage of his medications. RN Moore had given Mr. Gaines the correct dose and there was no error. After this episode, Mr. Gaines' medications were ordered to be crushed when dispensed to prevent diversion.

Mr. Gaines used illicit drugs while in prison that caused him to have seizures. He was also non-compliant with his medication and would hide it in his cheeks to keep from swallowing it. When he did this, he did not ingest enough of the medication for it to have a therapeutic effect. Mr. Gaines also saved medications to take multiple doses at a time, which caused him to have too much of the drug in his system and to seize. There were many instances where Mr. Gaines would request a particular seizure medication, for a variety of reasons, only to come back to Dr. Joseph a few days or a week later and request the medication be discontinued. Dr. Joseph took Mr. Gaines at face value and relied on him to tell her if a medication was ineffective or caused side effects. This bouncing back-and-forth of medications, however, sometimes caused a seizure. Patients have the right to refuse medications. Dr. Joseph would rather work with a patient and continue to adjust his medications and risk a seizure than have the patient refuse to take a medication altogether, which could cause more seizures and further harm to the patient. Every time Dr. Joseph prescribes medication, she explains the risks associated with that drug to the

patient, and, in this case, she explained to Mr. Gaines that if he did not take his medications regularly, and he continued to bounce between seizure medications, he was at risk for continued seizures.

On June 10, 2013, Mr. Gaines was admitted to the observation unit due to seizure activity related to medication non-compliance. On June 11, 2013, RN Moore performed a 12-hour assessment on Mr. Gaines. Mr. Gaines had a series of seizures around 7:00 a.m. lasting 10-15 minutes with intermittent cessations. Ativan was administered to his right glute. Mr. Gaines stopped seizing and regained consciousness within approximately five (5) minutes. Nursing staff also dispensed Tegretol, one of Mr. Gaines' regular seizure medications. Because Mr. Gaines had a known history of "cheeking" his medications, nursing staff looked inside his mouth to confirm that he had actually swallowed the pills. Upon inspection, nursing staff observed the pills in the side of his mouth. Mr. Gaines laughed when nursing found the cheeked medications.

On June 16, 2013, Dr. Joseph sent Mr. Gaines to the Terre Haute Regional Hospital for evaluation of his seizures. Mr. Gaines was supposed to stay at the hospital until June 17, 2013, for observation, but he refused further treatment after one day and returned to the prison.

On August 8, 2013, LPN White updated Mr. Gaines' Electronic Medical Record ("EMR") to note that Dr. Rajoli had issued a bottom bunk pass and bottom dormitory pass for six months. After the order expired, Mr. Gaines would need to be reassessed by a provider to have the passes renewed.

On August 21, 2013, Dr. Joseph met with Mr. Gaines to discuss his seizure medication. Mr. Gaines reported that the Tegretol he had been prescribed for his seizure disorder made him sick and he requested to re-start Depakote. Both medications are appropriate for Mr. Gaines' seizure disorder, so Dr. Joseph switched the medications, per his request.

On September 11, 2013, Dr. Joseph met with Mr. Gaines to discuss his seizure medication. Mr. Gaines reported that he had a seizure while taking Depakote, so he wanted to go back on Tegretol. Dr. Joseph discontinued the Depakote and ordered Tegretol, per his request.

On October 4, 2013, Dr. Joseph met with Mr. Gaines to follow-up on his seizure activity and make sure his medications were within their therapeutic ranges. Mr. Gaines requested to discontinue the Tegretol and only take Lamictal. Dr. Joseph discontinued the Tegretol per his request. Dr. Joseph also ordered Mr. Gaines a seizure helmet, per his request. On October 7, 2013, nursing staff reported that Mr. Gaines refused to accept the seizure helmet.

On March 31, 2014, LPN Owen responded to Mr. Gaines' RFHC #366620, in which he requested that his bottom bunk and bottom dorm passes be renewed. Due to Mr. Gaines' history of seizures, Dr. Joseph renewed the bottom bunk and bottom dorm passes for 180 days, both of which would expire on October 20, 2014. LPN Owen documented Dr. Joseph's orders into Mr. Gaines' medical record. LPN Owen had no other involvement in Mr. Gaines' medical care and treatment at times relevant to this lawsuit.

On June 9, 2014, Mr. Gaines suffered a seizure. During this seizure he cut his face under the left eye brow. Dr. Joseph evaluated Mr. Gaines, administered anesthetic to the affected area, and closed the wound with sutures. Mr. Gaines tolerated the procedure well and there were no complications.

On July 16, 2014, Dr. Joseph evaluated Mr. Gaines in the Chronic Care Clinic. Dr. Joseph had routinely monitored and adjusted his seizure medications for the last several months and no changes were needed at this time. Dr. Joseph had no other involvement in Mr. Gaines' medical care and treatment.

On October 8, 2014, LPN Edrington updated Mr. Gaines' EMR to document that Mr.

Gaines had refused to have his blood drawn for labs. He claimed he had a previously scheduled appointment that he needed to go to.

On December 29, 2014, NP Osborne was the provider of record when LPN Humphrey evaluated Mr. Gaines for right wrist pain. NP Osborne did not evaluate Mr. Gaines on that day and he did not know that Mr. Gaines was being evaluated, as he was not contacted for any orders.

On January 12, 2015, Mr. Gaines was scheduled to have blood drawn for labs by MA Pierce. Mr. Gaines refused to have his blood drawn and refused to sign the refusal form.

On February 19, 2015, LPN Felix evaluated Mr. Gaines in response to RFHC #393536 regarding back pain. Mr. Gaines inquired about a medication that he was supposed to receive. LPN Felix referred him to the provider so that the provider could explain what was going on with his medications, as she was not able to prescribe medication.

On March 15, 2015, RN Cleveland performed Mr. Gaines' annual health screening. RN Cleveland obtained Mr. Gaines' vital signs, which were normal. Mr. Gaines' chronic medical problems included hyperlipidemia, epilepsy, psoriasis, and alcohol dependence syndrome. Mr. Gaines' medications included Lamictal, Neurontin, and an antifungal cream.

On May 14, 2015, RN McDermit responded to Mr. Gaines' RFHC #390040 regarding back pain and his belief that his medication orders were incorrect. On May 17, 2015, LPN White evaluated Mr. Gaines in response to RFHC #403645 regarding toenail fungus. LPN White contacted Dr. Aluker who ordered an antifungal cream for Mr. Gaines. LPN White had no other involvement in Mr. Gaines' medical care and treatment at times relevant to this lawsuit.

On June 27, 2015, RN McWhirter, along with other nursing staff, responded to the dorms for a report of Mr. Gaines having a seizure. RN McWhirter observed Mr. Gaines have five seizures,

each lasting 30 to 60 seconds and he remained obtunded (slow to respond to stimulation). Custody staff told RN McWhirter that other offenders had reported that Mr. Gaines had been snorting unknown crushed pills and smoking spice before the seizure activity occurred. Custody staff transported Mr. Gaines to the medical unit. When they got to the medical unit, Narcan was administered due to the reported drug use. Narcan is a medication used to treat narcotic drug overdoses. It temporarily reverses the effects of opioid medicines. Narcan has no effect on people who are not taking opioid medicines. Mr. Gaines immediately startled and was alert and oriented as soon as the Narcan was administered. RN McWhirter reported the probable drug use to the sergeant on duty and requested a drug screen be drawn. At this, Mr. Gaines stated, "I have ears and I heard you tell the c/o I needed to be tested. I don't want you to take care of me anymore." Dkt. 232-15 at 184. He refused to allow RN McWhirter to look in his mouth or obtain further vitals. Mr. Gaines reported that he did not take his seizure medications the night before. Nursing staff administered his seizure medications at that time.

On June 29, 2015, Mr. Gaines was scheduled to have blood drawn to assess his Lamictal levels by MA Pierce but he refused to have his blood drawn and refused to sign the refusal form.

On July 14, 2015, Mr. Gaines submitted RFHC #360890 requesting a renewal of his bottom dorm pass. NP Warren ordered a bottom dorm pass and bottom bunk pass that would expire on January 14, 2016.

On July 15, 2015, RN Moore evaluated Mr. Gaines after custody staff reported that he had a seizure. When RN Moore arrived, Mr. Gaines was not seizing; he was awake but not alert. There was evidence that Mr. Gaines had vomited and that he was incontinent of urine. After about five (5) minutes, Mr. Gaines was alert and oriented to the date, location, surroundings, and situation. Mr. Gaines had no reported or observed injury from this seizure.

On July 27, 2015, RN McDermit responded to Mr. Gaines' RFHC #384235 regarding his request for a seizure helmet. RN McDermit responded that she would check into the matter. RN McDermit does not recall specifically what she did, but at a minimum, she would have forwarded the request on to the provider, as only a physician or nurse practitioner can prescribe a medical device. RN McDermit also responded to Mr. Gaines' RFCH #411252, which stated the following:

> I had a seizure on the 3rd or 4th and also the 14th or 15th. I am not sure why but I think. I don't know. I am also always tired and disoriented. Also the lights in the dorm & the heat have been terrible. I think I am having nocturnal seizures. Actually I know I am.

Dkt. 232-15 at 192.

In this RFHC, Mr. Gaines reported seizures that had occurred days and weeks prior. RN McDermit instructed Mr. Gaines to continue to take his Lamictal as prescribed for his seizure disorder.

On August 16, 2015, medical staff, including RN Cleveland, responded to Mr. Gaines' dorm after a Signal 3000 was called for a seizure. A Signal 3000 is the code for a medical emergency. On arrival, Mr. Gaines was sitting on the floor next to his bunk. He was awake and able to communicate. Mr. Gaines reported that he felt poorly and had nausea. There was evidence that Mr. Gaines had vomited. Shortly after RN Cleveland's arrival, Mr. Gaines had what appeared to be a seizure. RN Cleveland protected Mr. Gaines and his airway and after about a minute the seizure stopped. Mr. Gaines was transported to the medical unit. RN Cleveland monitored Mr. Gaines closely while he slept. After about two hours, Mr. Gaines woke up and requested a snack. A urine sample was collected due to a high suspicion that the seizure was related to drug use. This is the only time RN Cleveland had any involvement in Mr. Gaines' medical care and treatment related to his seizure disorder, as his employment with Corizon ended on September 15, 2015.

On August 17, 2015, LPN Hirt updated Mr. Gaines' EMR to note that Dr. Byrd had given a verbal order for Mr. Gaines to receive a seizure helmet, and that an e-mail had been sent to Kari Pierce to order the helmet. MA Pierce placed the order for Mr. Gaines' seizure helmet with the supplier. The helmet was on back order for quite a while. The same day, LPN Hirt responded to Mr. Gaines' two RFHC forms related to his request for a seizure helmet. LPN Hirt indicated that the seizure helmet would be ordered.

On August 26, 2015, Mr. Gaines submitted RFHC #412588 and #412587 asking about the seizure helmet the provider had ordered for him. He explained that some of the nurses had stated that he was going to have to wear the helmet 24 hours a day and he did not believe he should have to wear it all the time because he had auras and knew when he was going to have a seizure. HSA Bunch responded to each request and instructed Mr. Gaines to talk to the doctor as to specific orders regarding how often he was supposed to wear the helmet.

On September 15, 2015, Mr. Gaines submitted RFHC #414943 complaining about hitting his head during his seizures. MA Pierce responded by noting on October 2, 2015, that the helmet was received.

On September 28, 2015, LPN Hirt updated Mr. Gaines' EMR to note that the Regional Medical Director had requested another Neurontin level be drawn. On September 29, 2015, MA Pierce was assigned to draw Mr. Gaines' blood but Mr. Gaines refused to have his blood drawn. Mr. Gaines, as he had done many times in the past, also refused to sign the refusal form. MA Pierce had no other involvement in Mr. Gaines' medical care and treatment relevant to this lawsuit.

On September 30, 2015, LPN Hirt updated Mr. Gaines' EMR to note that Dr. Kiani had discontinued Mr. Gaines' Neurontin for failure to comply with the lab draw. Dr. Kiani gave an order to wean Mr. Gaines off Neurontin over a course of several days.

On October 2, 2015, LPN Edrington met with Mr. Gaines to give him his seizure helmet, which had just arrived at the prison. LPN Edrington explained that the provider had discontinued his Neurontin medication and ordered that his Lamictal be crushed when dispensed. Mr. Gaines signed a receipt for the helmet.

On October 7, 2015, Mr. Gaines submitted RFHC #413925 complaining of back pain due to a decrease in his Neurontin dosage. Mr. Gaines explained that Dr. Kiani had decreased his Neurontin dosage because he had failed to appear for a lab draw. Mr. Gaines wanted to speak to the Regional Medical Director to "straighten out this error." Dkt. 232-15 at 221. HSA Bunch responded to the RFHC and explained to Mr. Gaines that he would be placed back on the schedule to have his Neurontin level drawn and that the results would be sent to the Regional Medical Director.

On October 21, 2015, RN McDermit updated Mr. Gaines' EMR to note that Mr. Gaines had recently returned from Terre Haute Regional Hospital for a full seizure work-up. On November 9, 2015, LPN Hirt updated Mr. Gaines' EMR to note that physicians at Terre Haute Regional Hospital suggested that Mr. Gaines be weaned off of Lamictal. Mr. Gaines was slowly weaned off the medication over the course of several days.

On January 15, 2016, LPN Hirt updated Mr. Gaines' EMR to note that the prison physician and the Regional Medical Director had determined that Neurontin was not clinically indicated and would not be re-started. LPN Hirt had no other involvement in Mr. Gaines' medical care and treatment at times relevant to this lawsuit.

On February 16, 2016, LPN Edrington observed Mr. Gaines in the waiting area of the medical unit and he was not wearing his seizure helmet. LPN Edrington asked Mr. Gaines where his helmet was and he got angry and began to yell at her. Mr. Gaines said something to the effect

of: "when you prove to me that I have to wear it all the time, then we can discuss. You don't tell people to use their wheelchairs and canes." Dkt. 232-15 at 239. LPN Edrington had no other involvement in Mr. Gaines' medical care and treatment at times relevant to this lawsuit.

Corizon did not have a policy, practice, or custom of not providing seizure helmets to inmates with seizure disorders. Whether a patient with a history of seizures required a seizure helmet is determined by the provider (i.e., physician or nurse practitioner).

Corizon did not have a policy, practice, or custom of not recommending bottom dorm passes to patients with seizure disorders. Only a provider (i.e., physician or nurse practitioner) can recommend that a patient be moved to a bottom dorm. Whether the patient is moved to a bottom dorm is ultimately determined by custody staff.

Corizon did not have a policy, practice, or custom of not recommending an elevator pass to patients with seizure disorders. Only a provider can recommend that a patient be allowed to use an elevator. Dr. Joseph was never asked to provide Mr. Gaines with an elevator pass; however, during the time that she was Mr. Gaines' primary care physician, there was no clinical reason that Mr. Gaines could not use the stairs. Mr. Gaines reported that he had an "aura" before he had a seizure and knew when he was about to seize, so he could have avoided the stairs when he had an "aura," or he could have laid down if he was already on the stairs when he experienced this "aura."

## C. Analysis

At all times relevant to Mr. Gaines' claims in this action, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a

prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 8374 (1994); *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016) (*en banc*); *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014).

For purposes of this motion for summary judgment, Defendants do not dispute that Mr. Gaines' seizure disorder was an objectively serious medical need.

The subjective element of a deliberate indifference claim "requires more than negligence and it approaches intentional wrongdoing. The Supreme Court has compared the deliberate indifference standard to that of criminal recklessness." *Burton v. Downey,* 805 F.3d 776, 784 (7th Cir. 2015) (internal citation and quotation omitted). To constitute deliberate indifference, "a medical professional's treatment decision must be such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Petties,* 836 F.3d at 729 (internal quotation omitted).

"Individual liability under § 1983… requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago,* 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An *individual*

cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.... A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.")).

### 1. Claims Against Corizon

Because Corizon acts under color of state law by contracting to perform a government function, *i.e.* providing medical care to correctional facilities, it is treated as a government entity for purposes of Section 1983 claims. *See Minix v. Canarecci,* 597 F.3d 824, 832 (7th Cir. 2010); *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 fn. 6 (7th Cir. 2002). Therefore, to prove a deliberate indifference claim against Corizon, Mr. Gaines must establish that he suffered a constitutional deprivation as the result of an express policy or custom of Corizon. The Seventh Circuit has set forth several ways in which a plaintiff might prove this type of claim:

> First, she might show that the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Second, she might prove that the constitutional deprivation[ ] [was] visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels. Third, the plaintiff might be able to show that a government's policy or custom is made ... by those whose edicts or acts may fairly be said to represent official policy. As we put the point in one case, [a] person who wants to impose liability on a municipality for a constitutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government.... Either the content of an official policy, a decision by a final decisionmaker, or evidence of custom will suffice.

*Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (internal citations and quotations omitted).

"The central question is always whether an official policy, however expressed…caused the constitutional deprivation." *Id.*; *Pyles,* 771 F.3d at 409-10 (Plaintiff is "required to show that a [Corizon] policy was the direct cause of or moving force behind his constitutional injury.") (internal quotation omitted). There is no evidence that Corizon had any custom or policy of

denying seizure helmets to inmates with seizure disorders. There is no evidence that Corizon had a policy or custom of not recommending a bottom floor or an elevator pass to inmates with seizure disorders. The undisputed record shows that the decision to order a seizure helmet and bottom dorm or elevator passes was solely within the discretion of the medical providers. Corizon is entitled to summary judgment on the policy claims brought against it because there is simply no evidence that it had the policies or customs that Mr. Gaines alleges.

### 2. Ground Floor and Elevator Pass Claims

Mr. Gaines alleges that Farrah Bunch and Kathy Edrington denied him a permit to be housed on the ground floor. He also alleges that Farrah Bunch denied him an elevator pass. Nursing staff, including Farrah Bunch and Kathy Edrington, did not have the authority to recommend either a bottom dorm or an elevator pass. Custody staff determined where inmates were housed, but medical providers could recommend that a bottom floor and bottom bunk were clinically indicated. Nursing staff are not "medical providers" having that type of authority. Mr. Gaines has failed to submit any evidence showing that Farrah Bunch and Kathy Edrington, or any other nursing staff or medical providers, were deliberately indifferent to his desire to have a bottom floor or elevator pass. Moreover, he has not shown that using the elevator was medically necessary. These defendants are entitled to summary judgment in their favor.

Dr. Joseph's employment with Corizon ended on September 4, 2014. Prior to that time, she and other providers had ordered bottom bunk and bottom dorm passes for Mr. Gaines' seizure disorder.

### 3. Denial of Seizure Helmet Claims

Defendants Kathy Edrington, Farrah Bunch, Nurse Kayla McDermit, Nurse Graham Moore, L.P.N. Deborah White, Jessica Hirt, Peggy McWhirter, Tammy Owen, Barry Cleveland,

Kari Pierce, and Cassandra Felix did not deny any requests for a seizure helmet as alleged by Mr. Gaines. Moreover, as non-providers, they did not have the authority to deny a helmet or to determine whether a helmet was medically necessary. These defendants are entitled to summary judgment on this claim.

Mike Natalie's role as a HSA was purely administrative and he had no personal involvement in Mr. Gaines' medical care and treatment. He is entitled to summary judgment on this basis.

Mr. Gaines had head gear when he arrived at Putnamville in January 2013. Thereafter, rather than denying Mr. Gaines' request for head gear, Dr. Lolit Joseph ordered a seizure helmet in October 2013, and one was provided. Mr. Gaines did not submit any RFHCs in 2014 regarding a seizure helmet. Dr. Joseph's employment at Putnamville ended on September 4, 2014. No reasonable jury could find that Dr. Joseph was deliberately indifferent to Mr. Gaines' need for a seizure helmet. She is entitled to summary judgment on this claim.

Although NP Osborne was a medical provider, there is no evidence that he was involved with the treatment of Mr. Gaines' seizure disorder at any time, much less that he denied Mr. Gaines' request for head gear. NP Osborne is entitled to summary judgment.

Another helmet was ordered in August or September of 2015, but the helmet was on back order. No delay in providing the helmet is attributable to any defendant. It arrived at the prison on October 2, 2015, and LPN Edrington gave it to Mr. Gaines at that time.

### 4. Deliberate Indifference

Contrary to Mr. Gaines' allegations, the record demonstrates that the Defendants responded to Mr. Gaines' many medical needs in the Chronic Care Clinic. His medications were adjusted based on his requests and on the medical staff's professional judgment. Although he made it

difficult to do so, his blood levels were checked to make sure the seizure medications were being absorbed at therapeutic levels. However, Mr. Gaines often abused his medications in a way that caused or exacerbated his seizures. The medical records reflect that Mr. Gaines sometimes refused to wear his helmet. The undisputed evidence demonstrates that his own misconduct created a risk to his health and safety, rather than did any alleged failures on the part of any defendant in this case. There is no evidence of any defendant's failure to properly respond to Mr. Gaines' medical needs. Even if Mr. Gaines had presented evidence of negligence, which he has not, this would not be sufficient to rise to the high demands of proving a claim of deliberate indifference. "[S]howing mere negligence is not enough." *Petties*, 836 F.3d at 728. "Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known—is insufficient to make out a claim." *Id.* "Instead, the Supreme Court has instructed us that a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Id.* The Defendants have provided in their motion for summary judgment evidence refuting Mr. Gaines' allegations in all respects. Having failed to respond to the Defendants' motion for summary judgment, Mr. Gaines has not shown that any defendant acted with deliberate indifference to Mr. Gaines' serious medical needs.

## IV. Conclusion

Mr. Gaines has failed to present any evidence that would create a genuine issue of material fact as to his claims against the Defendants in this action. The Defendants have submitted undisputed admissible evidence showing that they are entitled to judgment as a matter of law. For the reasons explained above, the unopposed motion for summary judgment filed by the Defendants, dkt. [230], is **granted.**

Final judgment shall issue consistent with this Entry and with the screening Entry, dkt. 11, the stipulation of dismissal and termination of some defendants, dkt. 141, dkt. 151, dkt. 174, dkt. 204, and dkt. 219, and a prior summary judgment ruling, dkt. 244. In sum, all claims against all defendants are dismissed with prejudice.

**IT IS SO ORDERED.**

Date: 11/26/2018

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

DEANGELO GAINES
4902 Norwaldo Avenue
Indianapolis, IN 46205

James F. Bleeke
BLEEKE DILLON CRANDALL ATTORNEYS
jim@bleekedilloncrandall.com

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

Christopher Andrew Farrington
BLEEKE DILLON CRANDALL ATTORNEYS
drew@bleekedilloncrandall.com

Benjamin Myron Lane Jones
INDIANA ATTORNEY GENERAL
benjamin.jones@atg.in.gov

Ashlie K. Keaton
BLEEKE DILLON CRANDALL ATTORNEYS
ashlie@bleekedilloncrandall.com

Britney Jade McMahan
BLEEKE DILLON CRANDALL, PC
britney@bleekedilloncrandall.com

Nathan Aaron Pagryzinski
BLEEKE DILLON CRANDALL, P.C.
nathan@bleekedilloncrandall.com

Andrew Scheil
INDIANA ATTORNEY GENERAL
Andrew.Scheil@atg.in.gov